### WINSLOW et al. v. FEDERAL TRADE COMMISSION.*

### NORDEN SHIP SUPPLY CO., Inc., v. SAME.

(Circuit Court of Appeals, Fourth Circuit. November 1, 1921.)

Nos. 1887, 1892.

1. **Commerce ⇐⇒40(1)—Ship-chandlers selling goods brought from other states not engaged in interstate commerce.**

   That commodities dealt in by ship-chandlers in the state of Virginia were in large part transported into that state from other states, from which they were procured, did not constitute the sales made in Virginia interstate commerce, within the jurisdiction of the Federal Trade Commission; the interstate transportation having ended when the goods reached their destination and were placed in the ship-chandlers' warehouses.

2. **Commerce ⇐⇒40(1)—Ship-chandlers, selling supplies to vessels within the state, not engaged in foreign commerce, though supplies used on the high seas.**

   Ship-chandlers, selling goods from their storehouses in Virginia to ships lying in Hampton Roads, within the territorial limits of that state, were not engaged in interstate commerce, within the jurisdiction of the Federal Trade Commission, though the goods were used for the most part in navigating the high seas, and though the sales were made under

contracts, solicited and entered into in England, especially where such contracts were nothing but mere options given to the shipowners, of which they might or might not avail themselves.

On Petitions for Review of Orders of Federal Trade Commission. Original petitions by D. A. Winslow and others, a partnership doing business as D. A. Winslow & Co., and by the Norden Ship Supply Company, Incorporated, for review of orders of the Federal Trade Commission. Orders set aside and annulled.

Herbert G. Cochran and Henry Bowden, both of Norfolk, Va., for petitioners.

John W. Davis, of New York City (Adrien F. Busick, of Washington, D. C., Acting Chief Counsel of Federal Trade Commission, and Charles S. Moore, of Washington, D. C., on the brief), for respondent.

Before KNAPP and WOODS, Circuit Judges, and WATKINS, District Judge.

KNAPP, Circuit Judge. Each of these suits is brought, by petition filed originally in this court, to set aside and annul an order of the Federal Trade Commission requiring the parties named therein to cease and desist from certain practices, presently to be described, which are declared to be "unfair methods of competition in interstate and foreign commerce." The same questions arise in both cases. They were argued together and may properly be disposed of in one opinion.

In the case of D. A. Winslow & Co. the findings of the commission are reproduced in the margin,[1] but a shorter statement will dis-

[1] 1. That the respondents, D. A. Winslow. J. Jones, and D. H. Robishaw, are copartners doing business under the name and style of D. A. Winslow & Co., with their principal places of business located at Norfolk and Newport News, state of Virginia, and are now and at all time hereinafter mentioned have been engaged in selling provisions, merchandise, and other supplies for ships engaged in coastwise and foreign commerce, causing said commodities to be delivered to ships reaching ports in the state of Virginia while engaged in transporting passengers and commodities between ports in various states of the United States and in transporting passengers and commodities between American ports and ports in foreign countries, in due course of commerce among the several states of the United States or with foreign nations; that such supplies so sold by respondents are for consumption and use by the purchasers thereof upon the high seas in and beyond the territorial jurisdiction of the United States, said business being conducted by the respondents in direct competition with other persons, partnerships, and corporations similarly engaged.

2. That in the course of their business as described herein, the respondents purchase provisions. merchandise and other supplies for ships in the various states of the United States, transporting same from said places of purchase through other states to their places of business in the state of Virginia, where they are kept and stored for their trade in furnishing supplies for ships as aforesaid.

3. That in the course of their business of selling supplies for ships as described herein, the respondents in some instances secure orders for the sale of supplies from captains of ships after arrival at ports in the state of Virginia, dealing directly with the captains without having arrangements in advance with the owners to furnish their ships with supplies when calling at these ports; that approximately 90 per cent. of the respondents' business, amount-

close the practices held to be unlawful. The petitioners are ship-chandlers, having their principal place of business in Norfolk, Va., with a branch in Newport News. In those places they keep in stock and sell to ships coming to that port supplies of various kinds. Ninety per cent. of their business is with English ships, and they appear to cater to that trade. Deliveries are made by launches from their warehouses to ships lying at anchor in Hampton Roads, which is in the state of Virginia.

ing to as much as $750,000 in some years, is initiated with the owners of ships in foreign countries through contracts entered into and agreed upon, by a representative of the respondents soliciting business in those countries, in which the respondents agree to furnish ships with supplies when calling at Norfolk, and other ports in the state of Virginia, at prices named in the contracts, excepting when circumstances reasonably beyond the respondents' control compel them to vary such prices.

4. That upon the arrival of a ship and after arrangements have been made, either by contract or otherwise, for the respondents to furnish a ship with supplies, the captain, after some preliminary negotiations, usually visits one of the stores of the respondents in Norfolk or Newport News, and there selects and orders such supplies and in such quantities as he may determine his ship will require for its use in port and at sea; that after the supplies have been delivered and inspected and the ship is about to depart, the captain calls upon the respondents, checks over the bill for the supplies, and on his approval of same by signing it, the respondents secure payment of same from the agents of the owners at these ports authorized to pay the ship's disbursements, or by draft on the owners.

5. That in the course of their business of selling supplies for ships as described herein, the respondents for several years last past have given to the captain of practically all of the vessels to which they have furnished supplies, without the knowledge and consent of their employers and without other consideration therefor, large sums of money, amounting in some instances to as much as $400 or 5 per cent. of their bills as inducements to purchase and as gratuities for purchasing for the owners of the vessels operated by them, provisions, merchandise and other supplies for ships from the respondents.

6. In many instances where the respondents have contracts with shipowners to supply their vessels when calling at the ports at which respondents do business, such owners also have contracts or arrangements with ship-chandlers in other ports of the United States to furnish their ships supplies when calling at those ports; that the captains of vessels whose owners have such contracts or arrangements with ship-chandlers for supplies as herein described and found to exist, are required to purchase from ship-chandlers with whom the owners have such contracts or arrangements; that vessels of such owners frequently call at several ports of the United States on the same trip, and that captains are clothed with discretion to make their purchases at such port as they may select; that the payment of commissions and the giving of gratuities by respondents, as found in paragraph 5 hereof, have been for the purpose of inducing captains to purchase supplies from them rather than from their competitors at Norfolk or other ports; that failure of respondents to pay commissions and give gratuities has resulted and will result in captains purchasing supplies at other ports where ship-chandlers under contract or other arrangement with the owners will or may pay gratuities. In the case of what are termed "free ships," the owners do not have subsisting contracts with ship-chandlers to furnish supplies to the vessels when calling at ports of the United States, but the captains of such vessels have authority from the owners to purchase supplies at such ports, from such ship-chandlers, and in such quantities as the captain may deem necessary and advisable; that the payment of commissions and the giving of gratuities by respondents in such cases, have been to induce the captains to purchase supplies from the respondents.

When the transaction with a given ship has been completed by delivery of the supplies on board and receipt of payment therefor, the petitioners usually give the captain a gratuity, or commission on the purchase price, which is sometimes as much as 5 per cent., and amounts in instances to a considerable sum. They say that the making of such gifts, the purpose of which is obvious, is a custom of long standing, generally observed in the ship-chandlery trade, and well known to all ship owners. It is this payment of gratuities or commissions to captains purchasing supplies for their ships which the Federal Trade Commission holds to be unfair competition, and the order under review directs discontinuance of the practice. Other facts will be referred to in the brief discussion which follows:

[1] In carrying on the business thus outlined, were the petitioners engaged in interstate or foreign commerce? This is the fundamental question to be determined, since if they were not, the commission was without jurisdiction. The claim that they were engaged in interstate commerce rests wholly on the fact that the commodities in which they deal are in large part transported into Virginia from other states in which they are procured. But this transportation ends when the goods reach their destination and are placed in petitioners' warehouses in Norfolk and Newport News. They are then incorporated in the general stock of merchandise there held for sale, and become subject, so far as now concerns us, to the exclusive jurisdiction of the state of Virginia. Their subsequent sale and delivery within that state, with which alone the condemned practices are connected, is in no sense interstate commerce. In short, it is quite beyond doubt that the jurisdiction of the commission over the matter in hand cannot be supported by the prior, but independent and completed transportation of the goods, or some part of them, from another state. Brown v. Houston, 114 U. S. 622, 5 Sup. Ct. 1091, 29 L. Ed. 257; Robbins v. Taxing District, 120 U. S. 489, 497, 7 Sup. Ct. 592, 30 L. Ed. 694; Wagner v. Covington, 251 U. S. 95, 40 Sup. Ct. 93, 64 L. Ed. 157; American Harrow Co. v. Shaffer (C. C.) 68 Fed. 750; Ward Baking Co. v. Federal Trade Commission (C. C. A.) 264 Fed 330, directly in point; Roselle v. Commonwealth, 110 Va. 235, 65 S. E. 526.

[2] Were the petitioners engaged in foreign commerce? Their business is simply this: From stocks held in their storehouses in Virginia they sell and deliver supplies to ships lying in Hampton Roads, within the territorial limits of Virginia; that is, in waters under the jurisdiction of that state. The Abby Dodge, 223 U. S. 166, 32 Sup. Ct. 310, 56 L. Ed. 390. Their dealings in all cases are carried on and concluded in the state of Virginia. True, the supplies may be used by the ships—doubtless are used for the most part—in navigating the high seas, but with that use or other use the petitioners have nothing to do. Their relations with the ships cease entirely when the supplies are put on board and payment therefor is received. What becomes of them afterwards is beyond their control and in no wise their concern. This being so, how can it be said that the petitioners are engaged in foreign commerce? Surely not because, and solely because,

the ships to which they sell supplies in a Virginia port go from that port to foreign countries. The mere statement of the facts refutes the contention. Nor are we referred to any case in which such transactions as here appear are held to be foreign commerce, or in which similar transactions are held to be interstate commerce. It is indeed a novel proposition, to take a concrete example, that one who sells coal to an interstate railroad, which coal is necessary for and actually used on locomotives hauling interstate trains, is for that reason himself engaged in interstate commerce. To state the proposition is to reject it. Decisions under the Employers' Liability Act are not in point, or at most but beg the question. Could an action be maintained under that act by an employee of the coal dealer, in the case supposed, who was injured in delivering coal to the railroad, or by an employee of petitioners injured in delivering supplies to a ship? Only a negative answer can be given to either question, because it is manifest, as we think, that neither would the coal dealer be engaged in interstate commerce nor are the petitioners engaged in foreign commerce. The underlying principle as regards interstate commerce, equally applicable to foreign commerce, and in our judgment decisive of the instant case, is stated in Hooper v. California, 155 U. S. 648, 655, 15 Sup. Ct. 207, 210, 39 L. Ed. 297, as follows:

"If the power to regulate interstate commerce applied to all the incidents to which said commerce might give rise, and to all contracts which might be made in the course of its transaction, that power would embrace the entire sphere of mercantile activity in any way connected with trade between the states, and would exclude state control over many contracts purely domestic in their nature."

The circumstance that many and perhaps most of the sales in question are brought about by solicitation of the shipowners in England, and contracts entered into with them in that country, cannot serve to make foreign commerce of the business carried on by petitioners. In point of fact the so-called contracts are nothing but options given to the shipowners, of which they may or may not avail themselves; but, even if they be regarded as binding agreements for supplies to be furnished the ships in the port of Norfolk, in accordance with which the supplies are there delivered, the transactions would not on that account constitute foreign commerce. The petitioners send no goods abroad either as principals or agents or otherwise. The ships transport nothing for them or belonging to them or in which they are interested. Between them and the ships there is no relation of shipper and carrier, but only the relation of vendor and vendee. It therefore can make no difference, as respects the matter in dispute, whether the supplies are furnished under contracts previously made in England or under contracts made at the time with "free ships" in Norfolk harbor. As is said in Ware & Leland v. Mobile County, 209 U. S. 405, 413, 28 Sup. Ct. 526, 529 (52 L. Ed. 855, 14 Ann. Cas. 1031):

"These contracts are not, therefore, the subjects of interstate commerce, any more than in the insurance cases where the policies are ordered and delivered in another state than that of the residence and office of the company. The delivery, when one was made, was not because of any contract

obliging an interstate shipment, and the fact that the purchaser might thereafter transmit the subject-matter of purchase by means of interstate carriage did not make the contracts as made and executed the subjects of interstate commerce."

We see no occasion to expand the argument or multiply citations, since upon principle and authority alike it seems to us beyond serious question that the commission was without jurisdiction, because the business carried on by petitioners, and with which the condemned practices are connected, is neither interstate nor foreign commerce. And this conclusion makes it unnecessary to consider the other grounds upon which the invalidity of the commission's order is asserted.

The same facts in substance appear in the case of Norden Ship Supply Company, except that its dealings are mainly with ships from Scandinavian countries, and that it solicits business in those countries, and not in England. What is said above applies equally to this case and need not be repeated.

In each case a decree will be entered setting aside and annulling the order of the Federal Trade Commission for lack of jurisdiction.